## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN MANGANO, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>BLOCKFI, BLOCKFI, INC., BLOCKFI TRADING, LLC, BLOCKFI LENDING, LLC,<br><br>              Defendants. | Case No.   2:22-cv-1112<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff John Mangano ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants BlockFi, BlockFi, Inc. ("BFI"), BlockFi Trading, LLC ("Trading"), and BlockFi Lending, LLC ("Lending") (collectively, the "BlockFi Enities" or "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.     This is a class action lawsuit on behalf of all people in the United States who enrolled in a BlockFi Interest Account/Crypto Interest Account, which is an unregistered security under state and federal law. Since March 4, 2019, BFI, through its affiliates Lending and Trading has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts. BlockFi refers to these unregistered securities as its "Crypto Interest Account" or the "BlockFi Interest Account" (collectively, the "BIAs").

2.     Defendants did not register the BIAs with the United States Securities and Exchange Commission ("SEC") or with the California Commissioner of Corporations

("Commissioner").

3.      BFI is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, as well as engaging in proprietary trading.

4.      From March 4, 2019 to the present, BlockFi, a New Jersey-based financial services company and wholly owned subsidiary of BFI, has offered and sold BlockFi BIAs to investors, through which investors lend crypto assets to BlockFi in exchange for BlockFi's promise to provide a variable monthly interest payment.  BlockFi generated the interest paid out to BIA investors by deploying its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures.  As of March 31, 2021, BlockFi and its affiliates held approximately $14.7 billion in BIA investor assets.  As of December 8, 2021, BlockFi and its affiliates held approximately $10.4 billion in BIA investor assets, and had approximately 572,160 BIA investors, including 391,105 investors in the United States.

5.      BlockFi allows investors to purchase the BIAs by depositing certain eligible cryptocurrencies into accounts at BlockFi.  BlockFi then pools these cryptocurrencies together to fund its lending operations and proprietary trading.  In exchange for investing in the BIAs, investors are promised an attractive interest rate that is paid monthly in cryptocurrency.  The BIAs are not protected by Securities Investor Protection Corporation (the "SIPC") or insured by the Federal Deposit Insurance Corporation (the "FDIC").  The BIAs are subject to additional risk, compared to assets held at SIPC member broker-dealers, or assets held at banks and savings associations, almost all of which carry FDIC insurance.  Nor are they registered with the SEC, the Commissioner or any other securities regulatory authority, or exempt from registration. Despite the additional risk, and lack of safeguards and regulatory oversight, as of March 31, 2021, BlockFi

held the equivalent of $14.7 billion from the sale of these unregistered securities in violation of federal and state securities laws.

6.     Based on the facts and circumstances set forth herein, the BIAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because BlockFi offered and sold the BIAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[1] BlockFi promised BIA investors a variable interest rate, determined by BlockFi on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that BlockFi return their loaned assets at any time.   BlockFi thus borrowed the crypto assets in exchange for a promise to repay with interest.  Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's efforts in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest.  Investors also had a reasonable expectation that BlockFi would use the invested crypto assets in BlockFi's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from BlockFi's efforts.  BlockFi offered and sold the BIAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to BIA investors, and promoted the BIAs as an investment.  BlockFi offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from registration; as a result, BlockFi violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

7.     Because of Defendants' unregistered offers and sales of securities, the New Jersey

---

[1] https://www.sec.gov/litigation/investreport/34-81207.pdf (last visited 2/24/22).

Bureau of Securities, on or around July 20, 2021, issued a cease and desist order to BlockFi, Inc., Blockfi Lending, LLC, and BlockFi Trading, LLC requiring that said Defendants "halt[] the offer and sale of these unregistered securities."[2]  The cease and desist order did not preclude said Defendants "from paying interest on the existing BIAs or refunding principal to the BIA Investors."

8.      Later, on or around February 14, 2022, the SEC "charged BlockFi Lending LLC (BlockFi) with failing to register the offers and sales of its retail crypto lending product."[3]  Further, "[t]o settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and attempt to bring its business within the provisions of the Investment Company Act within 60 days.  BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product.  In parallel actions announced today, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges."

## PARTIES

9.      Plaintiff John Mangano is a citizen of the State of California and resides in Mountain View, California.  Mr. Mangano opened a BIA account from Defendants in the State of California and while residing in California.  Mr. Mangano therefore purchased an unregistered security from BlockFi in the form of the BIA account.  Mr. Mangano opened an account with BlockFi on or around August 31, 2021.  On August 31, 2021, Mr. Mangano made a Crypto Transfer of 7.00943484 Ethereum (ETH) cryptocurrency to the BlockFi platform to enroll in a BIA account.  On October 8, 2021, Mr. Mangano made a Crypto Transfer of 1.8050846 Litecoin (LTC) cryptocurrency to the BlockFi platform to enroll in a BIA account.  On October 20, 2021,

---

[2] https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf (last visited 2/24/22).
[3] https://www.sec.gov/news/press-release/2022-26 (last visited 2/24/22).

Mr. Mangano made a Crypto Transfer of 0.16943697 ETH to enroll in a BIA account.   In December 2021, Mr. Mangano deposited U.S. dollars to his BlockFi account to purchase Bitcoin (BTC) cryptocurrency for deposit in a BIA account.  Mr. Mangano purchased the BIA unregistered securities in the State of California and took delivery of the unregistered securities in California.

10. BlockFi, Inc. ("BFI") is a Delaware corporation, incorporated on August 1, 2017, with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.  BlockFi and Trading are wholly-owned subsidiaries of BFI.

11. BlockFi is a Delaware limited liability company formed on January 11, 2018, with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.  On March 4, 2019, BlockFi began publicly offering and selling BIAs.

12. BlockFi Trading, LLC ("Trading") is a Delaware limited liability company formed on May 28, 2019, with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.  Trading is a wholly owned subsidiary of BFI.

13. BlockFi Lending, LLC ("Lending") is a Delaware limited liability company formed on January 11, 2018, with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.

14. BFI conducts its business on the internet, through a website accessible to the general public at https://www.blockfi.com/ (the "BFI Website"), which is also accessible through BFI's own proprietary app via smartphone.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

16. Venue is proper under 28 U.S.C. § 1391 because Defendants have their principal

5

place of business in this District and therefore reside in this District.  Venue is further proper
pursuant to 15 U.S.C. § 78aa.

17.    This Court has personal jurisdiction over Defendants because they are subject to
general jurisdiction in this District because Defendants' principal place of business is in this
District.

## FACTS COMMON TO ALL CLAIMS

### A.  BlockFi Offered and Sold BIAs as Investment Opportunities

18.    On March 4, 2019, BlockFi publicly announced the launch of the BIA, through
which investors could lend crypto assets to BlockFi and in exchange, receive interest, "paid
monthly in cryptocurrency."  Interest began accruing the day after assets were transmitted to
BlockFi and compounded monthly, with interest payments made to accounts associated with each
BIA investor, in crypto assets, on or about the first business day of each month.

19.    BlockFi only accepts certain types of cryptocurrencies for deposit in a BIA.
According to the BFI Website, BIAs can be opened by depositing eligible cryptocurrency with
BlockFi's affiliate, Trading, who then transfers the deposited cryptocurrency to BlockFi, or by
sending a wire transfer to Trading to purchase eligible cryptocurrency, which Trading then
immediately transfers to BlockFi.

20.    BlockFi offered and sold BIAs to obtain crypto assets for the general use of its
business, namely to use the assets in its lending and investment activities, which generated income
both for BlockFi and to pay interest to BIA investors.  BlockFi pooled the loaned assets, and
exercised full discretion over how much to hold, lend, and invest.  BlockFi had complete legal
ownership and control over the loaned crypto assets, and advertised that it managed the risks
involved.

21.     According to the BFI Website, BlockFi uses Gemini Trust Company, LLC, a New York trust company, and BitGo, an institutional digital asset custodian, as its primary digital asset custodians for the BIAs.

22.     The BlockFi BIA Terms provide that a BlockFi BIA Investor relinquishes control over the deposited cryptocurrency to BlockFi and BlockFi is free to use those assets as it sees fit, including commingling cryptocurrency with those of other BIA Investors, investing those assets in the market, and lending those assets to institutional and corporate borrowers.  Without any control over the investments once deposited, the BIA Investors are passive investors.

23.     In purchasing an unregistered BIA, investors:

> [G]rant BlockFi the right, without further notice to [the investor], to hold the cryptocurrency held in [the] account in BlockFi's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

24.     BlockFi then pools these cryptocurrencies together, where according to BlockFi, it (1) reserves a portion of the cryptocurrencies to meet investor withdrawal demands, (2) lends some or all of the balance to third parties, or (3) purchases equities, options, and futures for its own account.  BlockFi uses the revenue from those activities to pay the BIA Investors the agreed-upon interest rate, and keeps the remainder for itself as profit.

25.     BlockFi does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom BlockFi has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of equities, options, and futures it trades; or (e) the

profits or losses derived from these activities.

26.     According to the BlockFi Interest Account Agreement for business accounts, corporate BIA Investors are offered a fixed interest rate on a certain minimum amount of digital currency deposits and then for any cryptocurrency deposited in the BIA in excess of the minimum amount, interest accrues at the interest rate "announced" by BlockFi pursuant to the BIA Terms. Despite the BIA Terms indicating that BlockFi does not require a minimum amount of cryptocurrency for deposit in the BIA, the BlockFi Interest Account Agreement for corporate accounts requires a certain minimum amount of digital currency deposits to be maintained in the account at all times until a stated maturity date.

27.     At all relevant times, BlockFi represented that it earned interest on the assets that it borrowed from BIA investors by lending those crypto assets to institutional borrowers.  Beginning in September 2020, BlockFi disclosed on its website that it also purchased "SEC-regulated equities and predominantly CFTC-regulated futures" using BIA assets.

28.     To begin investing in a BIA, an investor could transfer crypto assets to the digital wallet address assigned by BlockFi to the investor, or purchase crypto assets with fiat currency from BlockFi Trading for the purpose of investing in a BIA.  BlockFi Trading accepted the crypto asset or fiat from the investor, and then transferred the asset or fiat to BlockFi.  BlockFi did not hold private keys for the investors' wallet addresses; rather, investors' crypto assets were sent to BlockFi's wallet addresses at third-party custodians.



29.     BIA investors were permitted to withdraw the equivalent to the crypto assets they loaned to BlockFi at any time, with some limitations, and could borrow money in U.S. dollars against the amount of crypto assets deposited in BIAs.

30.     BlockFi adjusted the interest rates payable on BIAs for particular crypto assets periodically, and typically at the start of each month.  BlockFi set the rates based, in part, on "the yield that [BlockFi] can generate from lending," to institutional borrowers, and thus it was correlated with the efforts that BlockFi put in to generate that yield.  BlockFi periodically adjusted its interest rates payable on the BIAs in part after analysis of current yield on its investment and lending activity.  BIA investors could demand that BlockFi repay the loaned crypto assets at any time.

31.     BlockFi regularly touted the profits investors may earn by investing in a BIA. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry-leading 6.2% [annual percentage yield]," compounded monthly.  BlockFi described it as "an easy way for

crypto investors to earn bitcoin as they HODL."[4]

32.     The BFI Website advertises that the BIA "provides market-leading yields to crypto investors" and currently advertises an annual return of up to 7.5% on certain digital assets deposited in a BIA:




33.     The BFI Website contains a page with a detailed presentation of the cryptocurrencies it accepts for investment into the BIAs and the corresponding interest rates offered for each type of cryptocurrency deposit:

---

[4] "HODL" is a purposeful misspelling of "hold" and an acronym for "hold on for dear life," denoting buy-and-hold strategies in the context of crypto assets.

# Interest Rates

Check here to find the latest rates for interest-earning accounts and loans. Please note that interest rates, withdrawal limits, and fees are subject to change

## BlockFi Interest Account (BIA)

Annual Percentage Yield (APY)* BlockFi Interest Account clients can deposit their crypto and earn interest. Paid out at the beginning of every month, the interest earned by account holders compounds, increasing the annual yield for our clients. BlockFi uses a tiered Interest Structure. Click here to learn how our tiers work.

| Currency | Amount ** | APY |
|---|---|---|
| BTC (Tier 1) | 0 - 0.25 BTC | 4% |
| BTC (Tier 2) | 0.25 - 5 BTC | 1.5% |
| BTC (Tier 3) | > 5 BTC | 0.25% |
| ETH (Tier 1) | 0 - 5 ETH | 4% |
| ETH (Tier 2) | 5 - 50 ETH | 1.5% |
| ETH (Tier 3) | > 50 ETH | 0.25% |
| LTC (Tier 1) | 0 - 100 LTC | 4.5% |
| LTC (Tier 2) | > 100 LTC | 2% |
| LINK (Tier 1) | 0 - 750 LINK | 3% |
| LINK (Tier 2) | > 750 LINK | 0.5% |
| USDC (Tier 1) | 0 - 50,000 USDC | 7.5% |
| USDC (Tier 2) | > 50,000 USDC | 5% |

| GUSD (Tier 1) | 0 - 50,000 GUSD | 7.5% |
| GUSD (Tier 2) | > 50,000 GUSD | 5% |
| PAX (Tier 1) | 0 - 50,000 PAX | 7.5% |
| PAX (Tier 2) | > 50,000 PAX | 5% |
| PAXG (Tier 1) | 0 - 5 PAXG | 2% |
| PAXG (Tier 2) | > 5 PAXG | 0.5% |
| USDT (Tier 1) | 0 - 50,000 USDT | 7.5% |
| USDT (Tier 2) | > 50,000 USDT | 5% |
| BUSD (Tier 1) | 0 - 50,000 BUSD | 7.5% |
| BUSD (Tier 2) | > 50,000 BUSD | 5% |
| DAI (Tier 1) | 0 - 50,000 DAI | 8.5%**** |
| DAI (Tier 2) | > 50,000 DAI | 6%**** |
| UNI (Tier 1) | 0 - 750 | 3.75%**** |
| UNI (Tier 2) | > 750 | 1.5%**** |
| BAT (Tier 1) | 0 - 25,000 | 3.65%**** |
| BAT (Tier 2) | > 25,000 | 1.4%**** |

* APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in a company's ability to provide its clients yield on their crypto assets. For more information, please see our Terms of Service. Rates are subject to change. BlockFi will communicate any rate changes prior to these changes taking effect. Digital currency is not legal tender, is not backed by the government, and the BlockFi Interest Account (BIA) is not a bank account nor a brokerage account, and is not subject to FDIC or SIPC protections.

**Although there is no minimum balance required to earn interest, accounts are still subject to Gemini's withdrawal minimums: 0.003 BTC and 0.056 ETH. Withdrawals for balances smaller than these amounts may take up to 30 days to process.

***BlockFi Interest Accounts are available in most countries worldwide and all U.S. states other than NY

****Terms Apply

34.     Within the first few weeks of launching the BIA, BlockFi again touted investors' potential for profit.  On March 20, 2019, BlockFi announced that BIAs experienced significant growth, including from large firms who participated in BIAs "as a way to bolster their returns." BlockFi asserted that it "provide[d] the average crypto investor with the tools to build their wealth," and that it "look[ed] forward to giving even more investors a chance to earn a yield on their crypto."

35.     The BFI Website advertises the BIAs as part of a long-term investment strategy for investors, claiming that a BIA "provides clients with the ability to earn more crypto while holding

for long-term investments.  Interest is paid monthly and compounds.  This significantly increases the potential earnings of long-term account holders."

36.    The BFI Website includes a chart stating "BlockFi's Interest Account works hardest for you as a long-term investment," which claims to illustrate the projected effect of holding a BIA as a long-term investment:



37.    On April 1, 2019, BlockFi began to "tier" the interest rates that investors received, initially announcing that "BIA balances of up to and including 25 [Bitcoin] or 500 [Ether] (equivalent to roughly $100,000 and $70,000 respectively) will earn the 6.2% APY interest rate.

All balances over that limit will earn a tiered rate of 2% interest."  Even when changing the interest rates customers receive, BlockFi touted the yields to investors.  On August 27, 2021, BlockFi stated that the adjustments to interest rates are done "with the goal of maintaining great rates for the maximum number of clients."

38.     On January 1, 2021, BlockFi advertised that it had "distributed more than $50 million in monthly interest payments to [its] clients."

39.     As of November 1, 2021, the interest rates BlockFi paid investors ranged from 0.1% to 9.5%, depending on the type of crypto asset and the size of the investment.  For example, investors could receive 9.5% in interest for up to 40,000 Tether ("USDT") and 8.5% for anything over 40,000 USDT, as well as 4.5% interest for up to 0.1 Bitcoin ("BTC"), 1% for 0.1 to 0.35 BTC, and 0.1% for anything over 0.35 BTC.

40.     BlockFi offered and sold the BIA securities to investors, including retail investors, through advertising and general solicitations on its website, www.blockfi.com. BlockFi also promoted distribution of the BIA offering through its social media accounts, including YouTube, Twitter, and Facebook.  In addition, through its "Partner" program, an affiliate marketing program in which participants could "earn passive income by introducing your audience to financial tools for crypto investors," BlockFi extended its distribution of the BIA securities to retail investors through certain offers and promotions.

41.     BlockFi did not have a Securities Act registration statement filed or in effect with the SEC or the Commissioner for the offer and sale of the BIAs, nor did the offer and sale of BIAs qualify for an exemption from registration under the Securities Act.

**B.  The BIAs Were Unregistered Securities Sold To Investors In Violation of the Securities Act And California Law**

42.     The BFI Website claims that BFI is a "US regulated" entity, and that "[BlockFi]

14

play[s] by the rules, to the benefit of [BlockFi] and [its] clients." While certain of BlockFi's loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the BlockFi BIAs are not currently registered with any federal or state securities regulator, or exempt from registration – as required by law, even though the BIAs are "securities" and subject to such requirements.

43. BlockFi fails to disclose to BIA Investors that its BIA product is not currently registered by federal or state securities regulatory authorities, even though the BIA is a "security" and should be registered as such.

44. The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the BIAs were notes and thus securities. First, BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to BIA investors, and purchasers bought BIAs to receive interest ranging from 0.1% to 9.5% on the loaned crypto assets. Second, BIAs were offered and sold to a broad segment of the general public. Third, BlockFi promoted BIAs as an investment, specifically as a

way to earn a consistent return on crypto assets and for investors to "build their wealth."  Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to BIAs.

45.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract."  *See* 15 U.S.C. §§ 77b, 78c.  Based on the facts and circumstances set forth above, the BIAs were also offered and sold as "investment contracts," as they meet the elements for an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO*, citing *Forman*, 421 U.S. at 852-53 (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125,1130-31 (9th Cir. 1991) (finding managed account product was an investment contract where investors provided funds in exchange for interest rate earned through the issuer's investment of the funds).  BlockFi sold BIAs in exchange for the investment of money in the form of crypto assets.   BlockFi pooled the BIA investors' crypto assets, and used those assets for lending and investment activity that would generate returns for both BlockFi and BIA investors.  The returns earned by each BIA investor were a function of the pooling of the loaned crypto assets, and the ways in which BlockFi deployed those loaned assets.  In this way, each investor's fortune was tied to the fortunes of the other investors.  In addition, because BlockFi earned revenue for itself through its deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, *i.e.*, BlockFi.  Through its public statements, BlockFi created a reasonable expectation that BIA investors would earn profits derived from BlockFi's efforts to manage the loaned crypto assets profitably enough to pay the stated interest rates to the

investors.  BlockFi had complete ownership and control over the borrowed crypto assets, and determined how much to hold, lend, and invest.  BlockFi's lending activities were at its own discretion, and BlockFi advertised that it managed the risks involved.  Similarly, its investment activities were at its own discretion, and BlockFi could decide whether and how to invest the BIA assets in equities or futures.

46.     BlockFi did not have a registration statement filed or in effect with the SEC or the Commissioner for the offers and sales of BIAs, nor did it qualify for an exemption from registration under the Securities Act for those offers and sales.

47.     As a result of the conduct described above, BlockFi violated Section 5(a) of the Securities Act, which prohibits, unless a registration statement is in effect as to a security, any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

48.     As a result of the conduct described above, BlockFi also violated Section 5(c) of the Securities Act, which prohibits any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

49.     By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

50.     Similarly, the California Corporations Code contains a similar prohibition on the

sale of unregistered securities to investors.

51.     California's definition of a "security" in Corp. Code § 25019 was modeled after Section 2(a)(1) of the Securities Act of 1933, and includes some 23 instruments meeting the definition, such as "any note; stock; treasury stock; . . . certificate of interest or participation in any profit-sharing agreement; . . . transferable share; [and] investment contract. . . ."  Court decisions interpreting the scope of the definition of a "security" under the Securities Act of 1933 are persuasive authority under the California statute, and courts have interpreted the term "security" to be synonymous in scope with the term "investment contract" in federal securities law cases. *See* 1 Marsh & Volk, PRACTICE UNDER THE CALIFORNIA CORPORATE SECURITIES LAWS § 5.19[1][b], [d] (2019).

52.     In addition to meeting the definition of a "security" under the SEC Framework and the federal *Howey* test, the BIAs also satisfy the four elements of the "risk capital test" as articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961) ("*Silver Hills*") to qualify as a "security" under California law.

53.     California courts have held that that both the *Silver Hills* and *Howey* tests may be applied, either separately or together, to determine whether a transaction is a security under California law—in other words*,* a transaction is a security if it satisfies either test. *People v. Black*, 8 Cal. App. 5th 889, 900 (2007) (holding that California "proceed[s] under the framework of both tests, either separately or together"); *Consol. Mgmt. Grp., LLC v. Dep't of Corporations*, 162 Cal. App. 4th 598, 610 (2008) (same); *People v. Schock*, 152 Cal. App. 3d 379 (1984) (both tests applied, and transaction held to be a security under federal test); *People v. Smith*, 215 Cal. App. 3d 230, 237 (while California courts often use the risk capital test for defining a security, it is "a general test, and is not applicable in all situations. Federal definitions of securities are also used in

California when appropriate in determining whether an investment vehicle is a security. . . .").

54.     For the reasons discussed herein, Defendants' BIAs are also unregistered securities under California law.

55.     As such, Defendants are also liable to Plaintiff and class members for violation of California Securities Law.

## CLASS ALLEGATIONS

56.     Plaintiff brings this action individually and on behalf of the following Class of persons:  All persons or entities in the United States who purchased or enrolled in a BIA.  Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

57.     Plaintiff also seeks to represent a subclass consisting of Class members in California who purchased or enrolled in a BIA (the "Subclass").

58.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Subclass may be expanded or narrowed by amendment or amended complaint.

59.     **Numerosity.**  The members of the Class and Subclass are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class and Subclass.  Although the precise number of Class members is unknown to Plaintiff, the true number of Class members is known by Defendants and may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

60.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

    (a)    whether the BIAs were unregistered securities under federal and California law;

    (b)    Whether Defendants' offerings and sales of BIAs violates the registration provisions of the Securities Act and the California Corporations Code;

    (c)    whether Defendants are liable to Plaintiff, the Class, and Subclass for unjust enrichment; and

    (d)    The type and measure of damages suffered by Plaintiff and the Class.

61.    **Typicality.**  Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, all Class and Subclass members were similarly situated and were comparably injured through Defendants' wrongful conduct as set forth herein.  Further, there are no defenses available to Defendants that are unique to Plaintiff.

62.    **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class and Subclass.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class and Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclass.

63.    **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclass members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible

for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

64.     In the alternative, the Class and Subclass may also be certified because:

(a)     the prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant;

(b)     the prosecution of separate actions by individual Class and Subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Unregistered Offer and Sale of Securities in Violation of
### Section 5 of the Securities Act
### (Against All Defendants)

65.     Plaintiff hereby incorporates by reference the allegations contained in all preceding

paragraphs of this complaint.

66.     Plaintiff brings this claim individually and on behalf of the members of the Class

and Subclass against Defendants.

67.     Defendants made use of means or instruments of transportation or communication

in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such

securities to be carried through the mails or in interstate commerce for the purpose of sale or for

delivery after sale.

68.     The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act,

15 U.S.C. § 77b(a)(1) (defining "security" to include a "note" and an "investment contract").

69.     Plaintiff and members of the Class and Subclass purchased BIAs securities through

the BlockFi website and/or smartphone application.

70.     15 U.S.C. §§ 77e(a) states:

> Unless a registration statement is in effect as to a security, it shall be
> unlawful for any person, directly or indirectly—
>
>> (1) to make use of any means or instruments of
>> transportation or communication in interstate commerce or
>> of the mails to sell such security through the use or medium
>> of any prospectus or otherwise; or
>>
>> (2) to carry or cause to be carried through the mails or in
>> interstate commerce, by any means or instruments of
>> transportation, any such security for the purpose of sale or
>> for delivery after sale.

71.     As discussed above, there was no registration statement in effect related to the

BIAs.

72.     By selling unregistered BIAs to Plaintiff and Class members, Defendants violated 15 U.S.C. §§ 77e(a), and are liable to Plaintiff and the members of the Class and Subclass.  15 U.S.C. § 77l(a).

73.     As a direct and proximate result of Defendants' unregistered sale of BIA securities, Plaintiff and members of the Class and Subclass suffered damages.

### COUNT II
**Unregistered Offer and Sale of Securities in Violation of California Corporations Code Section 25110 and 25503**
**(Against All Defendants)**

74.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

75.     Plaintiff brings this claim individually and on behalf of the members of the Subclass against Defendants.

76.     The BIAs are securities within the meaning of the California Corporations Code.

77.     The BIAs were and are required to be registered with the Commissioner under California law.

78.     The BIAs have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

79.     Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

80.     Plaintiff purchased BIA securities from Defendants.

81.     By reason of the foregoing, each of the Defendants have violated Sections 25110

and 25503 of the California Corporations Code.

82.     As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and members of the Subclass have suffered damages in connection with their respective purchases of BIA securities.

**COUNT III**
**Unjust Enrichment**
**(Against All Defendants)**

83.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

84.     Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against Defendants.

85.     Plaintiff and members of the Class and Subclass conferred a benefit on Defendants in the form of monies and cryptocurrencies paid to Defendants for the purpose of enrolling in a BIA account offered by Defendants.

86.     Defendants voluntarily accepted and retained this benefit by accepting payment of money and cryptocurrency from Plaintiff and Class members in exchange for the BIA account, when Defendants knew that the BIA accounts were risky unregistered securities.  Defendants used the money and cryptocurrencies paid to them to enrich themselves in the form of investing and lending out the cryptocurrencies, or trading with the same.

87.     Defendants have retained this benefit.  Accordingly, Defendants should disgorge the money and cryptocurrency accepted in exchange for the BIAs.

88.     It would be unjust and inequitable for Defendants to retain the benefit, and Defendants should be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)  For an order certifying the Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b)  For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(c)  For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(d)  For prejudgment interest on all amounts awarded;

(e)  For an order of restitution and all other forms of equitable monetary relief;

(f)  For injunctive relief as pleaded or as the Court may deem proper; and

(g)  For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 1, 2022                            Respectfully submitted,

                                                By:    */s/ Andrew J. Obergfell*
                                                        Andrew J. Obergfell

                                                **BURSOR & FISHER, P.A.**
                                                Andrew J. Obergfell
                                                888 Seventh Avenue
                                                New York, NY 10019
                                                Telephone: (646) 837-7150
                                                Facsimile: (212) 989-9163
                                                Email: aobergfell@bursor.com

                                                **BURSOR & FISHER, P.A.**
                                                Scott A. Bursor (*Pro Hac Vice* forthcoming)
                                                701 Brickell Ave, Suite 1420,

25

Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: scott@bursor.com

*Attorneys for Plaintiff*