# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN MANGANO and MICHAEL LEIFMAN, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-01112-KM-CLW |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| BLOCKFI, BLOCKFI, INC., BLOCKFI TRADING, LLC, BLOCKFI LENDING, LLC, | |
| Defendants. | |

Plaintiffs John Mangano and John Leifman ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants BlockFi, BlockFi, Inc. ("BFI"), BlockFi Trading, LLC ("Trading"), and BlockFi Lending, LLC ("Lending") (collectively, the "BlockFi Enities" or "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge. Plaintiffs believe that substantial additional evidence will be adduced through discovery in support of these claims.

## NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.      This is a class action lawsuit on behalf of all people in the United States who enrolled in a BlockFi Interest Account/Crypto Interest Account, which is an unregistered security under state and federal law. Since March 4, 2019, BFI, through its affiliates Lending and Trading has been, at least in part, funding its lending operations, proprietary trading and other revenue generating activities. through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts. BlockFi refers to these unregistered securities as its

"Crypto Interest Account" or the "BlockFi Interest Account" (collectively, the "BIAs").

2.      Defendants did not register the BIAs with the United States Securities and Exchange Commission ("SEC") or with the California Commissioner of Corporations ("Commissioner") or any other state.

3.      BFI is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, as well as engaging in proprietary trading.

4.      From March 4, 2019 to the present, BlockFi, a New Jersey-based financial services company and wholly owned subsidiary of BFI, has (directly or indirectly through other BFI subsidiaries) offered and sold BlockFi BIAs to investors, through which investors lend crypto assets to BlockFi in exchange for BlockFi's promise to provide a variable monthly interest payment. BlockFi generated the interest paid out to BIA investors by deploying its assets in various ways, including loans of investors' crypto assets made to institutional, corporate and other borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures. As of March 31, 2021, BlockFi and its affiliates held approximately $14.7 billion in BIA investor assets. As of December 8, 2021, BlockFi and its affiliates held approximately $10.4 billion in BIA investor assets, and had approximately 572,160 BIA investors, including 391,105 investors in the United States.

5.      BlockFi allows investors to purchase the BIAs by depositing certain eligible cryptocurrencies into accounts at BlockFi. BlockFi then pools these cryptocurrencies together to fund its lending operations and proprietary trading. In exchange for investing in the BIAs, investors are promised a rate of return paid monthly in cryptocurrency that is does not adequately account for the true risks being undertaken. The BIAs are not protected by Securities Investor Protection Corporation (the "SIPC") or insured by the Federal Deposit Insurance Corporation

(the "FDIC").  The BIAs are subject to additional risk, compared to assets held at SIPC member broker-dealers, or assets held at banks and savings associations, almost all of which carry FDIC insurance.  Nor are they registered with the SEC, the Commissioner or any other securities regulatory authority, or exempt from registration. The BIAs are subject to other risks described herein. Despite these additional risks, and lack of disclosures and safeguards and regulatory oversight, as of March 31, 2021, BlockFi held the equivalent of $14.7 billion from the sale of these unregistered securities in violation of federal and state securities laws.

6.      Based on the facts and circumstances set forth herein, the BIAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because BlockFi offered and sold the BIAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[1]  BlockFi promised BIA investors a variable interest rate, determined solely by BlockFi on a periodic basis, in exchange for crypto assets loaned by the investors, who were told in public statements that they could demand their loaned assets at any time, even though the fine print in documents appear to give BlockFi the right to deny withdrawals or sales of the BIAs.   BlockFi thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's efforts in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest.  Investors also had a reasonable expectation that BlockFi would use the invested crypto assets in BlockFi's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from BlockFi's

---

[1] https://www.sec.gov/litigation/investreport/34-81207.pdf (last visited 2/24/22).

efforts.  BlockFi offered and sold the BIAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to BIA investors, and promoted the BIAs as an investment.  BlockFi offered and sold securities without a registration statement filed or in effect with the Commission or any states and without qualifying for an exemption from registration; as a result, BlockFi violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") and state regulators.

7.     Because of Defendants' unregistered offers and sales of securities, the New Jersey Bureau of Securities, on or around July 20, 2021, issued a cease and desist order to BlockFi, Inc., Blockfi Lending, LLC, and BlockFi Trading, LLC requiring that said Defendants "halt[] the offer and sale of these unregistered securities."[2]  The cease and desist order did not preclude said Defendants "from paying interest on the existing BIAs or refunding principal to the BIA Investors."

8.     Later, on or around February 14, 2022, the SEC "charged BlockFi Lending LLC (BlockFi) with, inter alia, failing to register the offers and sales of its retail crypto lending product."[3]  Further, "[t]o settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and attempt to bring its business within the provisions of the Investment Company Act within 60 days.  BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product.  In parallel actions announced today, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges."  In connection with that announcement, BlockFi's CEO publicly promised that the BIAs would be registered with the SEC.

---

[2] https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf (last visited 2/24/22).
[3] https://www.sec.gov/news/press-release/2022-26 (last visited 2/24/22).

9.      In the Arizona state settlement, the Arizona Corporation Commission ordered BlockFi Lending, LLC to pay a $943,396 administrative penalty for offering and selling unregistered securities in the form of interest-bearing digital asset deposit accounts to Arizona investors.

10.     The Arizona Commission found BlockFi failed to comply with Arizona's securities registration requirements and, as a result, investors were sold unregistered securities in violation of state law and deprived of critical information and disclosure necessary to understand the potential risks regarding the BIAs.[4]  The Commission found that a statement on BlockFi's website also materially overstated the degree to which BlockFi's collateral practices protected its ability to pay investors.

11.     According to the Iowa consent order, BlockFi employees thought that the institutional investors would be willing to provide security on the loans, meaning they would guarantee other assets to BlockFi if they couldn't pay their loans.[5]  "But it quickly became apparent that large institutional investors were frequently not willing to post large amounts of collateral to secure their loans."  "About 24% of loans were overcollateralized in 2019.  About 16% were overcollateralized in 2020."

12.     The Iowa consent order also stated "(BlockFi Interest Accounts) investors did not have complete and accurate information with which to evaluate the risk that ... BlockFi would be unable to comply with its obligation to pay."

13.     Based on materials on BlockFi's website, financial statements, and publicly available materials, defendants knew, or should have known that BlockFi's guiding investment

---

[4] https://azcc.gov/azinvestor/news/2022/06/30/corporation-commission-joins-with-other-state-securities-regulators-and-the-s.e.c.-to-settle-with-a-digital-asset-lending-platform-for-unlawful-securities-sales (last visited 7/28/22).
[5] https://www.desmoinesregister.com/story/money/business/2022/06/14/sec-settlement-crypto-firm-blockfi-provide-iowa-943-000/7629947001/ (last visited 7/28/22).

objective for customer portfolios was supposed to be preservation of capital and liquidity in even the most turbulent of market conditions.

14.     Defendants had a duty to properly keep investor or class member funds in a segregated account and have adequate capitalization so that investors could redeem, withdraw, or close accounts in full on demand and failed to do so.

15.     As a result, it would be impossible for all investors or class members to redeem or withdraw their funds in full or close their accounts at once on any given time.

16.     Defendants improperly pledged class members' securities that should have been segregated. The funds generated by class members' securities were used by Defendants to fund speculative and risky loans to companies with liquidity problems like a $1 billion loan to venture firm Three Arrows Capital, which was not properly disclosed to BlockFi customers.[6]

17.     Furthermore, BlockFi did not warn or provide notice to class members that BlockFi may need to register its offers and sales of BIAs.  Nor did BlockFi warn customers that it may be violating securities laws, subject to enforcement actions, cease-and desist orders, penalties, and lawsuits from every state in the country.

18.     Such disclosures would have given account holders the information necessary to properly evaluate and formulate the requisite return or interest on their accounts with BlockFi. Because these disclosures were never made, BlockFi account holders were not given sufficient information to evaluate the relevant risks, and they did not receive a return on their investments commensurate with those risks.

19.     Had investors and class members known or even been warned about their exposure to unregistered securities, SEC fines, state fines, lawsuits, judgments, consent orders,

---

[6] https://coingeek.com/three-arrows-capital-sinks-sucking-down-cash-and-investors-alike/ (last visited 7/28/22).

6

increased bankruptcy risk, account redemption freezes and asset loss, they would have required a higher rate of return or greater interest payments on their investments with BlockFi before investing.

20.     Leaving account holders in the dark of these known and substantial risks, BlockFi capitalized on account holder ignorance of these substantial and debilitating risks to profit from paying artificially low interest payments to class members.

21.     Defendants participated in this conduct in order to realize unjust returns in form of income, commissions, compensation, and profits associated with these loans at the risk of bankruptcy and losing customer investment.

22.     As a result of the above, Plaintiffs and class members are entitled to rescission, disgorgement, disgorgement of all income, profits, commissions, and compensation received by defendants, compensatory damages, and punitive damages.

## **PARTIES**

23.     Plaintiff John Mangano is a citizen of the State of California and resides in Mountain View, California.  Mr. Mangano opened a BIA account from Defendants in the State of California and while residing in California.  Mr. Mangano therefore purchased an unregistered security from BlockFi in the form of the BIA account.  Mr. Mangano opened an account with BlockFi on or around August 31, 2021.  On August 31, 2021, Mr. Mangano made a Crypto Transfer of 7.00943484 Ethereum (ETH) cryptocurrency to the BlockFi platform to enroll in a BIA account.  On October 8, 2021, Mr. Mangano made a Crypto Transfer of 1.8050846 Litecoin (LTC) cryptocurrency to the BlockFi platform to enroll in a BIA account.  On October 20, 2021, Mr. Mangano made a Crypto Transfer of 0.16943697 ETH to enroll in a BIA account.  In December 2021, Mr. Mangano deposited U.S. dollars to his BlockFi account to purchase Bitcoin (BTC) cryptocurrency for deposit in a BIA account.  Mr. Mangano purchased the BIA

unregistered securities in the State of California and took delivery of the unregistered securities in California.

24.     Plaintiff Michael Leifman is a citizen of the State of New Jersey and resides in Newark, New Jersey.  Mr. Leifman opened a BIA account from Defendants in the State of New Jersey and while residing in New Jersey.  Mr. Leifman therefore purchased an unregistered security from BlockFi in the form of the BIA account.  Mr. Leifman opened an account with BlockFi on or around April 5, 2021.  On January 28, 2022, Mr. Leifman made a BIA deposit of 0.00443915 Bitcoin (BTC) cryptocurrency using the BlockFi platform.  On January 28, 2022, Mr. Leifman made a BIA deposit of 1.00636137 Ethereum (ETH) cryptocurrency using the BlockFi platform.  On January 28, 2022, Mr. Leifman made a BIA deposit of 2.36822116 Chainlink (LINK) cryptocurrency using the BlockFi platform.  On January 28, 2022, Mr. Leifman made a BIA deposit of 0.39144462 Litecoin (LTC) cryptocurrency using the BlockFi platform.  On January 29, 2022, Mr. Leifman made a BIA deposit of 0.4 ETH cryptocurrency using the BlockFi platform.  On January 29, 2022, Mr. Leifman made a BIA deposit of 0.01784 BTC cryptocurrency using the BlockFi platform.  On January 31, 2022, Mr. Leifman made a BIA deposit of 8.3727371 Uniswap (UNI) cryptocurrency using the BlockFi platform.  On January 31, 2022, Mr. Leifman made a BIA deposit of 56.96568409 Basic Attention Token (BAT) cryptocurrency using the BlockFi platform.  On January 31, 2022, Mr. Leifman made a BIA deposit of 0.44578034 LTC cryptocurrency using the BlockFi platform.  On February 11, 2022, Mr. Leifman made a BIA deposit of 0.00149712 ETH cryptocurrency using the BlockFi platform.  Mr. Leifman purchased the BIA unregistered securities in the State of New Jersey and took delivery of the unregistered securities in New Jersey.

25.     BlockFi, Inc. ("BFI") is a Delaware corporation, incorporated on August 1, 2017,

with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.  BlockFi and

Trading are wholly-owned subsidiaries of BFI.

26.     BlockFi is a Delaware limited liability company formed on January 11, 2018,

with offices at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.  On March 4, 2019,

BlockFi began publicly offering and selling BIAs.

27.     BlockFi Trading, LLC ("Trading") is a Delaware limited liability company

formed on May 28, 2019, with offices at 201 Montgomery Street, Suite 263, Jersey City, New

Jersey.  Trading is a wholly owned subsidiary of BFI.

28.     BlockFi Lending, LLC ("Lending") is a Delaware limited liability company

formed on January 11, 2018, with offices at 201 Montgomery Street, Suite 263, Jersey City, New

Jersey.

29.     BFI conducts its business on the internet, through a website accessible to the

general public at https://www.blockfi.com/ (the "BFI Website"), which is also accessible through

BFI's own proprietary app via smartphone.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over claims under the Securities Act

pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire

action under 28 U.S.C. § 1367.

31.     Venue is proper under 28 U.S.C. § 1391 because Defendants have their principal

place of business in this District and therefore reside in this District.  Venue is further proper

pursuant to 15 U.S.C. § 78aa.

32.     This Court has personal jurisdiction over Defendants because they are subject to

general jurisdiction in this District because Defendants' principal place of business is in this

District.

**FACTS COMMON TO ALL CLAIMS**

**A.      BlockFi Offered and Sold BIAs as Investment Opportunities**

33.      On March 4, 2019, BlockFi publicly announced the launch of the BIA, through which investors could lend crypto assets to BlockFi and in exchange, receive interest, "paid monthly in cryptocurrency."  Interest began accruing the day after assets were transmitted to BlockFi and compounded monthly, with interest payments made to accounts associated with each BIA investor, in crypto assets, on or about the first business day of each month.

34.      BlockFi only accepts certain types of cryptocurrencies for deposit in a BIA. According to the BFI Website, BIAs can be opened by depositing eligible cryptocurrency with BlockFi's affiliate, Trading, who then transfers the deposited cryptocurrency to BlockFi, or by sending a wire transfer to Trading to purchase eligible cryptocurrency, which Trading then immediately transfers to BlockFi.

35.      BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business, namely to use the assets in its lending and investment activities, which generated income both for BlockFi and to pay interest to BIA investors.  BlockFi pooled the loaned assets, and exercised full discretion over how much to hold, lend, and invest.  BlockFi had complete legal ownership and control over the loaned crypto assets, and advertised that it managed the risks involved.

36.      According to the BFI Website, BlockFi uses Gemini Trust Company, LLC, ("GTC") a New York trust company, and BitGo, an institutional digital asset custodian, as its primary digital asset custodians for the BIAs.  GTC was recently sued by the CFTC for making misleading misrepresentations in connection with certain self-certifications.  The major

10

investors/owners of GTC are also major investors/owners of BlockFi, namely Winklevoss Capital.  GTC is a custodian which also lends assets to third parties to generate fees, including assets for which it acts as a custodian.  Thus, the common ownership of GTC and BlockFi, which was undisclosed to investors, created a risk of conflicts to BlockFi arising out of the fact that GTC and its owners could use their control over BlockFi to have BlockFi pay unfairly low interest rates so that GTC could maximize its profits when it lent out the BlockFi assets custodied with GTC to third parties at higher rates.

37.     The BlockFi BIA Terms provide that a BlockFi BIA Investor relinquishes control over the deposited cryptocurrency to BlockFi and BlockFi is free to use those assets as it sees fit, including commingling cryptocurrency with those of other BIA Investors, investing those assets in the market, and lending those assets to institutional and corporate borrowers.  Without any control over the investments once deposited, the BIA Investors are passive investors.

38.     In purchasing an unregistered BIA, investors:

> [G]rant BlockFi the right, without further notice to [the investor], to hold the cryptocurrency held in [the] account in BlockFi's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

39.     BlockFi then pools these cryptocurrencies together, where according to BlockFi, it (1) reserves a portion of the cryptocurrencies to meet investor withdrawal demands, (2) lends some or all of the balance to third parties, or (3) purchases equities, options, and futures for its own account.  BlockFi uses the revenue from those activities to pay the BIA Investors the agreed-upon interest rate, and keeps the remainder for itself as profit.

40.     BlockFi does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom BlockFi has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of equities, options, and futures it trades; or (e) the profits or losses derived from these activities.

41.     According to the BlockFi Interest Account Agreement for business accounts, corporate BIA Investors are offered a fixed interest rate on a certain minimum amount of digital currency deposits and then for any cryptocurrency deposited in the BIA in excess of the minimum amount, interest accrues at the interest rate "announced" by BlockFi pursuant to the BIA Terms.  Despite the BIA Terms indicating that BlockFi does not require a minimum amount of cryptocurrency for deposit in the BIA, the BlockFi Interest Account Agreement for corporate accounts requires a certain minimum amount of digital currency deposits to be maintained in the account at all times until a stated maturity date.

42.     At all relevant times, BlockFi represented that it earned interest on the assets that it borrowed from BIA investors by lending those crypto assets to institutional borrowers. Beginning in September 2020, BlockFi disclosed on its website that it also purchased "SEC-regulated equities and predominantly CFTC-regulated futures" using BIA assets.

43.     To begin investing in a BIA, an investor could transfer crypto assets to the digital wallet address assigned by BlockFi to the investor, or purchase crypto assets with fiat currency from BlockFi Trading for the purpose of investing in a BIA.  BlockFi Trading accepted the crypto asset or fiat from the investor, and then transferred the asset or fiat to BlockFi.  BlockFi did not hold private keys for the investors' wallet addresses; rather, investors' crypto assets were sent to BlockFi's wallet addresses at third-party custodians.



44.     BIA investors were permitted to withdraw the equivalent to the crypto assets they loaned to BlockFi at any time, with some limitations, and could borrow money in U.S. dollars against the amount of crypto assets deposited in BIAs.

45.     BlockFi adjusted the interest rates payable on BIAs for particular crypto assets periodically, and typically at the start of each month.  BlockFi set the rates based, in part, on "the yield that [BlockFi] can generate from lending," to institutional borrowers, and thus it was correlated with the efforts that BlockFi put in to generate that yield.  BlockFi periodically adjusted its interest rates payable on the BIAs in part after analysis of current yield on its investment and lending activity.  BIA investors could demand that BlockFi repay the loaned crypto assets at any time, but BlockFi had retained for itself the discretion to refuse to honor requests for sales or withdrawals.

46.     BlockFi regularly touted the profits investors may earn by investing in a BIA. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry-leading 6.2% [annual percentage yield]," compounded monthly.  BlockFi described it as "an easy

way for crypto investors to earn Bitcoin as they HODL."[7]

47.    The BFI Website advertises that the BIA "provides market-leading yields to crypto investors" and currently advertises an annual return of up to 7.5% on certain digital assets deposited in a BIA:




48.    The BFI website contains a page with a detailed presentation of the cryptocurrencies it accepts for investment into the BIAs and the corresponding interest rates offered for each type of cryptocurrency deposit:

---

[7] "HODL" is a purposeful misspelling of "hold" and an acronym for "hold on for dear life," denoting buy-and-hold strategies in the context of crypto assets.

# Interest Rates

Check here to find the latest rates for interest-earning accounts and loans. Please note that interest rates, withdrawal limits, and fees are subject to change

## BlockFi Interest Account (BIA)

Annual Percentage Yield (APY)* BlockFi Interest Account clients can deposit their crypto and earn interest. Paid out at the beginning of every month, the interest earned by account holders compounds, increasing the annual yield for our clients. BlockFi uses a tiered Interest Structure. Click here to learn how our tiers work.

| Currency | Amount ** | APY |
|---|---|---|
| BTC (Tier 1) | 0 - 0.25 BTC | 4% |
| BTC (Tier 2) | 0.25 - 5 BTC | 1.5% |
| BTC (Tier 3) | > 5 BTC | 0.25% |
| ETH (Tier 1) | 0 - 5 ETH | 4% |
| ETH (Tier 2) | 5 - 50 ETH | 1.5% |
| ETH (Tier 3) | > 50 ETH | 0.25% |
| LTC (Tier 1) | 0 - 100 LTC | 4.5% |
| LTC (Tier 2) | > 100 LTC | 2% |
| LINK (Tier 1) | 0 - 750 LINK | 3% |
| LINK (Tier 2) | > 750 LINK | 0.5% |
| USDC (Tier 1) | 0 - 50,000 USDC | 7.5% |
| USDC (Tier 2) | > 50,000 USDC | 5% |

| GUSD (Tier 1) | 0 - 50,000 GUSD | 7.5% |
| GUSD (Tier 2) | > 50,000 GUSD | 5% |
| PAX (Tier 1) | 0 - 50,000 PAX | 7.5% |
| PAX (Tier 2) | > 50,000 PAX | 5% |
| PAXG (Tier 1) | 0 - 5 PAXG | 2% |
| PAXG (Tier 2) | > 5 PAXG | 0.5% |
| USDT (Tier 1) | 0 - 50,000 USDT | 7.5% |
| USDT (Tier 2) | > 50,000 USDT | 5% |
| BUSD (Tier 1) | 0 - 50,000 BUSD | 7.5% |
| BUSD (Tier 2) | > 50,000 BUSD | 5% |
| DAI (Tier 1) | 0 - 50,000 DAI | 8.5%**** |
| DAI (Tier 2) | > 50,000 DAI | 6%**** |
| UNI (Tier 1) | 0 - 750 | 3.75%**** |
| UNI (Tier 2) | > 750 | 1.5%**** |
| BAT (Tier 1) | 0 - 25,000 | 3.65%**** |
| BAT (Tier 2) | > 25,000 | 1.4%**** |

\* APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in a company's ability to provide its clients yield on their crypto assets. For more information, please see our Terms of Service. Rates are subject to change. BlockFi will communicate any rate changes prior to these changes taking effect. Digital currency is not legal tender, is not backed by the government, and the BlockFi Interest Account (BIA) is not a bank account nor a brokerage account, and is not subject to FDIC or SIPC protections.

\*\*Although there is no minimum balance required to earn interest, accounts are still subject to Gemini's withdrawal minimums: 0.003 BTC and 0.056 ETH. Withdrawals for balances smaller than these amounts may take up to 30 days to process.

\*\*\*BlockFi Interest Accounts are available in most countries worldwide and all U.S. states other than NY

\*\*\*\*Terms Apply

49.    Within the first few weeks of launching the BIA, BlockFi again touted investors' potential for profit.  On March 20, 2019, BlockFi announced that BIAs experienced significant growth, including from large firms who participated in BIAs "as a way to bolster their returns." BlockFi asserted that it "provide[d] the average crypto investor with the tools to build their wealth," and that it "look[ed] forward to giving even more investors a chance to earn a yield on their crypto."

50.    The BFI Website advertises the BIAs as part of a long-term investment strategy for investors, claiming that a BIA "provides clients with the ability to earn more crypto while

holding for long-term investments.  Interest is paid monthly and compounds.  This significantly increases the potential earnings of long-term account holders."

51.    The BFI Website includes a chart stating "BlockFi's Interest Account works hardest for you as a long-term investment," which claims to illustrate the projected effect of holding a BIA as a long-term investment:



52.    On April 1, 2019, BlockFi began to "tier" the interest rates that investors received, initially announcing that "BIA balances of up to and including 25 [Bitcoin] or 500 [Ether] (equivalent to roughly $100,000 and $70,000 respectively) will earn the 6.2% APY interest rate.

All balances over that limit will earn a tiered rate of 2% interest."  Even when changing the interest rates customers receive, BlockFi touted the yields to investors.  On August 27, 2021, BlockFi stated that the adjustments to interest rates are done "with the goal of maintaining great rates for the maximum number of clients."

53.     On January 1, 2021, BlockFi advertised that it had "distributed more than $50 million in monthly interest payments to [its] clients."  Since BlockFi paid interest in Bitcoin rather than dollars this statement was materially misleading.

54.     As of November 1, 2021, the interest rates BlockFi paid investors ranged from 0.1% to 9.5%, depending on the type of crypto asset and the size of the investment.  For example, investors could receive 9.5% in interest for up to 40,000 Tether ("USDT") and 8.5% for anything over 40,000 USDT, as well as 4.5% interest for up to 0.1 Bitcoin ("BTC"), 1% for 0.1 to 0.35 BTC, and 0.1% for anything over 0.35 BTC.

55.     BlockFi offered and sold the BIA securities to investors, including retail investors, through advertising and general solicitations on its website, www.blockfi.com. BlockFi also promoted distribution of the BIA offering through its social media accounts, including YouTube, Twitter, and Facebook.  In addition, through its "Partner" program, an affiliate marketing program in which participants could "earn passive income by introducing your audience to financial tools for crypto investors," BlockFi extended its distribution of the BIA securities to retail investors through certain offers and promotions.

56.     BlockFi did not have a Securities Act registration statement filed or in effect with the SEC or the Commissioner for the offer and sale of the BIAs, nor did the offer and sale of BIAs qualify for an exemption from registration under the Securities Act.

**B.      The BIAs Were Unregistered Securities Sold To Investors In Violation of the Securities Act, California Law, and New Jersey Law**

57.      The BFI Website claims that BFI is a "US regulated" entity, and that "[BlockFi] play[s] by the rules, to the benefit of [BlockFi] and [its] clients."  While certain of BlockFi's loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the BlockFi BIAs are not currently registered with any federal or state securities regulator, or exempt from registration – as required by law, even though the BIAs are "securities" and subject to such requirements.

58.      BlockFi fails to disclose to BIA Investors that its BIA product is not currently registered by federal or state securities regulatory authorities, even though the BIA is a "security" and should be registered as such.  Nor does BlockFi disclose that it is an " investment company" under the Investment Company Act of 1940.  ("1940 Act")

59.      The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market."  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).  They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors.  *Id.*  Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note."  *See* 15 U.S.C. §§ 77b & 78c.  A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny.  Applying the *Reves* four-part analysis, the BIAs were notes and thus securities.  First, BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business, namely to run its lending and

19

investment activities to pay interest to BIA investors, and purchasers bought BIAs to receive interest ranging from 0.1% to 9.5% on the loaned crypto assets.  Second, BIAs were offered and sold to a broad segment of the general public.  Third, BlockFi promoted BIAs as an investment, specifically as a way to earn a consistent return on crypto assets and for investors to "build their wealth."  Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to BIAs.

60.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract."  *See* 15 U.S.C. §§ 77b, 78c.  Based on the facts and circumstances set forth above, the BIAs were also offered and sold as "investment contracts," as they meet the elements for an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO*, citing *Forman*, 421 U.S. at 852-53 (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125,1130-31 (9th Cir. 1991) (finding managed account product was an investment contract where investors provided funds in exchange for interest rate earned through the issuer's investment of the funds).  BlockFi sold BIAs in exchange for the investment of money in the form of crypto assets.  BlockFi pooled the BIA investors' crypto assets, and used those assets for lending and investment activity that would generate returns for both BlockFi and BIA investors.  The returns earned by each BIA investor were a function of the pooling of the loaned crypto assets, and the ways in which BlockFi deployed those loaned assets.  In this way, each investor's fortune was tied to the fortunes of the other investors.  In addition,

because BlockFi earned revenue for itself through its deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, *i.e.*, BlockFi.  Through its public statements, BlockFi created a reasonable expectation that BIA investors would earn profits derived from BlockFi's efforts to manage the loaned crypto assets profitably enough to pay the stated interest rates to the investors.  BlockFi had complete ownership and control over the borrowed crypto assets, and determined how much to hold, lend, and invest.  BlockFi's lending activities were at its own discretion, and BlockFi advertised that it managed the risks involved.  Similarly, its investment activities were at its own discretion, and BlockFi could decide whether and how to invest the BIA assets in equities or futures.

61.     BlockFi did not have a registration statement filed or in effect with the SEC or the Commissioner for the offers and sales of BIAs, nor did it qualify for an exemption from registration under the Securities Act for those offers and sales.

62.     As a result of the conduct described above, BlockFi violated Section 5(a) of the Securities Act, which prohibits, unless a registration statement is in effect as to a security, any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

63.     As a result of the conduct described above, BlockFi also violated Section 5(c) of the Securities Act, which prohibits any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any

security, unless a registration statement has been filed as to such security.

64.     By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

65.     Similarly, the California Corporations Code contains a similar prohibition on the sale of unregistered securities to investors.

66.     California's definition of a "security" in Corp. Code § 25019 was modeled after Section 2(a)(1) of the Securities Act of 1933, and includes some 23 instruments meeting the definition, such as "any note; stock; treasury stock; . . . certificate of interest or participation in any profit-sharing agreement; . . . transferable share; [and] investment contract. . . ."  Court decisions interpreting the scope of the definition of a "security" under the Securities Act of 1933 are persuasive authority under the California statute, and courts have interpreted the term "security" to be synonymous in scope with the term "investment contract" in federal securities law cases.  *See* 1 Marsh & Volk, PRACTICE UNDER THE CALIFORNIA CORPORATE SECURITIES LAWS § 5.19[1][b], [d] (2019).

67.     In addition to meeting the definition of a "security" under the SEC Framework and the federal *Howey* test, the BIAs also satisfy the four elements of the "risk capital test" as articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961) ("*Silver Hills*") to qualify as a "security" under California law.  BIA also qualifies as a security under New Jersey law.

68.     California courts have held that that both the *Silver Hills* and *Howey* tests may be applied, either separately or together, to determine whether a transaction is a security under California law—in other words, a transaction is a security if it satisfies either test. *People v. Black*, 8 Cal. App. 5th 889, 900 (2007) (holding that California "proceed[s] under the framework

of both tests, either separately or together"); *Consol. Mgmt. Grp., LLC v. Dep't of Corporations*, 162 Cal. App. 4th 598, 610 (2008) (same); *People v. Schock*, 152 Cal. App. 3d 379 (1984) (both tests applied, and transaction held to be a security under federal test); *People v. Smith*, 215 Cal. App. 3d 230, 237 (while California courts often use the risk capital test for defining a security, it is "a general test, and is not applicable in all situations. Federal definitions of securities are also used in California when appropriate in determining whether an investment vehicle is a security. . . .").

69.     For the reasons discussed herein, Defendants' BIAs are also unregistered securities under California law and New Jersey law.

70.     As such, Defendants are also liable to Plaintiffs and class members for violation of California Securities Law and New Jersey law.

71.     The unregistered status of BlockFi left investors with no source of information about BlockFi, its solvency, liquidity, the terms of investments made using funds from BIA accounts, concentrations of risk, conflicts of interest, ability to pay interest, loan principal and the ability to permit investor withdrawals from BIA accounts.

72.     BlockFi's opaqueness could have been mitigated.  Throughout 2020 and 2021 and 2022, BlockFi reused to offer "Proof of Reserves" to its clients (*i.e.* class members) despite the industry trend in that direction stated by industry players such as Ledn; Gate.io; Coinshares; Bit MEX; Nexo; and Kraken.  Proof of Reserves allows clients to individually verify that the client's assets were accounted for.

73.     BlockFi admitted in 2022 that there had been "increased withdrawal demand." Eventually BlockFi admitted that it needed  hundreds of millions of dollars of additional liquidity from outside sources to continue its operations.  BlockFi did not even have a fraction of the

liquidity or access to capital to allow investors to withdraw funds without causing a "run on the bank."

74.     While it was looking for emergency financing, BlockFi was offered only financing packages which would subordinate client assets to the new lenders.

75.     In late June 2022, Crypto Exchange FTX provided a $250 million emergency lines of credit to BlockFi.  Reportedly, equity investors in BlockFi were "wiped out" and had written off losses.

76.     On April 13, 2022 BlockFi, Inc.  assumed the obligations of BlockFi Lending LLC, a wholly owned subsidiary of BlockFi, Inc. under interest bearing accounts and converted the "BlockFi Interest Accounts" to "BlockFi Lending Accounts."  In a filing with the SEC on April 11, 2022, BlockFi advised the SEC that neither the BIAs nor the BlockFi Lending Accounts would be registered.  This filing appears to mean that BlockFi will not honor its promise to register the BIAs.

77.     In May 2022, BlockFi reduced the interest rates paid to clients by approximately 50%.

78.     On June 24, 2022, BlockFi issued a "Blog Post" stated it was raising interest rates, across all rate tiers, for BTC, ETH, USDC, GUSD, PAX, BUSD and USDT. At the time, BlockFi reiterated its promise to "continually set rates based on market dynamics for lending and borrowing."

79.     Effectively July 1, 2022 BlockFi eliminated the free withdrawal once per month for certain types of digital assets and now charged up to $25 per withdrawal.  This change hit class members hard inasmuch as in 2022 over 75% of BlockFi crypto withdrawals were without fees.

80.     Due to the lack of registration, class members are currently unable to fund the accounts and therefore cannot make further investments or pay down loans. All plaintiffs and class members relied on the misrepresentations and/or integrity of the market for Bitcoin and/or the *Affiliated Ute* presumptions with respect to omissions for the presumption of reliance as to any claims wherein reliance is an element.

81.     Defendants could have known, and likely did know, of the problems with its loans to other crypto entities through monitoring of "on-chain data" which is used by crypto platforms to trace crypto traders and lenders' transactions.

82.     The SEC has concluded that the BIAs were NOT individually tailored to customers ( class members) demands or requests or inquiries.  SEC Order at 29,38-39.

## CLASS ALLEGATIONS

83.     Plaintiffs bring this action individually and on behalf of the following Class of persons:  All persons or entities in the United States who purchased or enrolled in a BIA. Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

84.     Plaintiffs also seek to represent a subclass consisting of Class members in California who purchased or enrolled in a BIA (the "California Subclass").

85.     Plaintiffs also seek to represent a subclass consisting of Class members in New Jersey who purchased or enrolled in a BIA (the "New Jersey Subclass").

86.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Subclasses may be expanded or narrowed by

amendment or amended complaint.

87.   **Numerosity.**  The members of the Class and Subclasses are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of members in the Class and Subclasses.  Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendants and may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

88.   **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)   whether the BIAs were unregistered securities under federal and California law;

(b)   Whether Defendants' offerings and sales of BIAs violates the registration provisions of the Securities Act and the California Corporations Code;

(c)   whether Defendants are liable to Plaintiffs, the Class, and Subclasses for unjust enrichment; and

(d)   The type and measure of damages suffered by Plaintiffs and the Class.

89.   **Typicality.**  Plaintiffs' claims are typical of the claims of the other members of the Class in that, among other things, all Class and Subclasses members were similarly situated and were comparably injured through Defendants' wrongful conduct as set forth herein.  Further,

there are no defenses available to Defendants that are unique to Plaintiffs.

90.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class and Subclasses.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class or Subclasses.

91.     **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclass members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

92.     In the alternative, the Class and Subclasses may also be certified because:

(a)     the prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of

conduct for the Defendant;

(b)     the prosecution of separate actions by individual Class and Subclass members

would create a risk of adjudications with respect to them that would, as a

practical matter, be dispositive of the interests of other Class members not

parties to the adjudications, or substantially impair or impede their ability to

protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the

Class as a whole, thereby making appropriate final declaratory and/or

injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION
## COUNT I

**Unregistered Offer and Sale of Securities in Violation of
Section 5 of the Securities Act and Section 15(a)
(Against All Defendants on behalf of the National Class)**

93.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding

paragraphs of this complaint.

94.     Plaintiffs bring this claim individually and on behalf of the members of the Class

against Defendants.

95.     Defendants made use of means or instruments of transportation or communication

in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such

securities to be carried through the mails or in interstate commerce for the purpose of sale or for

delivery after sale.

96.     The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act,

15 U.S.C. § 77b(a)(1) (defining "security" to include a "note" and an "investment contract").

97.     Plaintiffs and members of the Class purchased BIAs securities through the BlockFi

website and/or smartphone application.

98.     15 U.S.C. §§ 77e(a) states:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

99.     As discussed above, there was no registration statement in effect related to the BIAs.

100.    By selling unregistered BIAs to Plaintiffs and Class members, Defendants violated 15 U.S.C. §§ 77e(a), and are liable to Plaintiffs and the members of the Class. 15 U.S.C. § 77l(a).

101.    Defendants by and through their stock ownership of BlockFi controlled BlockFi and exercised such control to cause it to engage in the illegal practices described herein and are therefore liable as controlling persons of BlockFi.

102.    As a direct and proximate result of Defendants' unregistered sale of BIA securities, Plaintiffs and members of the Class suffered damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

## **COUNT II**

**Violations of Section 12(a)(2) and Section 15 of the Securities Act**
**(Against All Defendants For Offering Solicitation And Sale Of Unregistered Securities**
**Through Materially False Solicitations on behalf of a Nationwide Class)**

103.    Plaintiffs repeat and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

105.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against the Defendants issuer and against all other Defendants for control person liability.  This Count is not alleging fraud or intentional conduct or recklessness.

106.     Defendants are "sellers" for purposes 12(a)(2) of the Securities Act pursuant to 17 C.F.R. §230.159A.

107.     Defendants had direct and active participation in the solicitation of Plaintiffs' and Class members' purchases and communicated directly with Plaintiffs and the Class through the offering materials for its own financial interest and are also a "statutory sellers" under Section 12(a)(2).

108.     Plaintiffs and the other members of the Class acquired BIAs solicited and sold pursuant to written materials which were materially false and misleading.

109.     As alleged above, the written materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein as more fully set forth in Count III, infra.

110.     Defendants owed to acquirers of its securities, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in solicitation and sales materials and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.

111.     Plaintiffs and the other members of the Class acquired BIAs securities solicited by

and pursuant to the materials described herein and neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in those offering documents.

112.    By virtue of these violations, Plaintiffs and the other members of the Class have sustained damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

113.    Less than one year has elapsed from the time that Plaintiffs discovered the facts upon which this complaint is based to the time that Plaintiffs filed the Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

114.    By and through their stock ownership of BlockFi Defendants had the power and exercised same to cause BlockFi to engage in the illegal acts described herein and are therefore liable as controlling persons.

## COUNT III

**Violation Of Section 10(b) and 20(a) of The Securities
Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against All Defendants on behalf of a Nationwide Class)**

115.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

117.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class

to purchase BIAs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

118.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BIAs and was an effort to maintain artificially high market prices for BIAs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

119.    Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the BIAs.  These defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BIAs securities during the Class Period.

120.    BlockFi never disclosed any information about the concentration of its crypto counterparties.  Neither Plaintiffs nor class members had any way to know that BlockFi was working with undercapitalized borrowers such as Celsius, Three Arrow Capital and others.

121.    BlockFi various functions and services, as well as its diverse array of client's in

the Bitcoin – lending ecosystem together with BlockFi's obligation to its shareholders to maximize profits led to multiple conflicts with Plaintiffs and the class which were undisclosed. For example it was never disclosed to investors that Winklevoss Capital, a major investor/owner of BlockFi (in the amount of $1.9 billion) was also a major owner of GTC, BlockFi's custodian. GTC is also in the business of lending crypto assets to third parties for fees.  Accordingly, GTC had an interest in maximizing its rate of return at the expense of BlockFi investors.

122.    Defendants failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders.  BlockFi CEO Zak Prince admitted in July 2022, that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

123.    BlockFi's undisclosed rehypothecation profoundly affected BlockFi's solvency because the "collateral" touted by defendants as a foundation of BlockFi's stability and security was illusory and profoundly threatened its solvency.

124.    Unbeknownst to class members or investors at large, BlockFi had a $1 billion loan out to Three Arrows Capital for which BlockFi reportedly held collateral that was likely rehypothecated by BlockFi.

125.    While BlockFi reported that the Three Arrows loan was over-collateralized by 30%, it appeared later that two thirds of that collateral (approximately $1 billion) was Bitcoin of indeterminate origin.  The other third of the collateral was shares of Grayscale Bitcoin Trust ("GBTC") itself a crypto investment product.  When BlockFi attempted to liquidate its GBTC collateral the price plunged. Despite the so-called "over-collateralization" of the Three Arrows loans, BlockFi CEO announced that BlockFi lost $80,000,000 when it liquidated the Three

Arrows' collateral.

126.    As a revealed through publication of the Settlement Order, BlockFi's investments (*i.e.* the use to which it put investors/class members funds) consisted of "loans of crypto assets and US dollars to counterparties, investments in crypto assets trust and funds, and intercompany receivables." This information was not disclosed to investors and rendered other statements misleading.

127.    BlockFi misled investors by claiming to be a "market intermediary" which exempted it from the 1940 Act registration requests.  However, that representation was false because unlike true "market intermediaries BlockFi did not make transactions on both sides of the market for "financial contracts."

128.    Defendants represented that its loans were "typically" over collateralized when in fact most large institutional loans which presented liquidity and concentration of risk damages to BlockFi were not over collateralized.  SEC Order 23-23, 25.  The aforesaid misrepresentations deprived investors of "complete and accurate information with which to evaluate the risk "to class members investments if BlockFi institutional borrowers defaulted. Order 23, 35.

129.    BlockFi's statements about collateralization were also materially false and misleading for implying that risks of investing in BlockFi were minimal because of its reported "over-collateralization" without disclosing that BlockFi was exposed to additional material risk though its broad range of yield generating activities in addition to borrowing and lending crypto assets and its rehypothecation activity.

130.    The defendants' public representations about investors' ability to demand monies back and/or sell the Bitcoin were also false.

131.    The Defendants' primary and controlling person liability arises from the

following facts: (i) the Defendants through any by stock ownership, were privy to and participated in the creation, development and sales of BIAs and (ii) each of these defendants knew, was aware of, or recklessly disregarded the Company's dissemination of information to the class that was misleading false or misleading.

132.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and disclose such facts, even though these facts were readily available to them.  Defendants' material misrepresentations and/or omission were done knowingly or recklessly.  Defendants' materially false and misleading statements and omissions clearly demonstrate that, if they did not have actual knowledge of the misrepresentations and omission alleged, they were reckless in failing to obtain such knowledge and deliberately refrained from taking the steps necessary to determine whether those statements were false or misleading.

133.   The  ("Controlling Defendants") acted as controlling persons of Block within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions and due to their participation in and/or control of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Materials filed with the SEC, had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Materials that Plaintiffs contends are materially incomplete and misleading.

134.   Had Plaintiffs and the members of the Class known the truth regarding the Company, Plaintiffs and the Class would not have purchased the BIAs.  At the very least, Plaintiffs and the other members of the Class would not have purchased BIAs at the artificially inflated prices which they paid.

135.    As a result of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

136.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

**Unregistered Offer and Sale of Securities in Violation of California
Corporations Code Section 25110 and 25503
(Against all Defendants on behalf of the California Subclass)**

137.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

138.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendants.

139.    The BIAs are securities within the meaning of the California Corporations Code.

140.    The BIAs were and are required to be registered with the Commissioner under California law.

141.    The BIAs have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

142.    Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

143.    Plaintiffs purchased BIA securities from Defendants.

144.    By reason of the foregoing, each of the Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

36

145.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the California Subclass have suffered damages in connection with their respective purchases of BIA securities and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

## COUNT V

**Unregistered Offer and Sale of Securities in Violation of
The New Jersey Uniform Securities Law, N.J.S.A. 49:3-60
(Against All Defendants on behalf of The National Class and the New Jersey Subclass)**

146.    Plaintiffs hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

147.    Plaintiffs brings this claim individually and on behalf of the members of the Class and the New Jersey Subclass against Defendants.

148.    The BIAs are securities as defined in N.J.S.A. 49:3-49(m) (defining "security" to include a "note" and an "investment contract").

149.    The BIAs were and are required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

150.    The BIAs have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

151.    Defendants, including BlockFi, Trading and BFI have offered and sold unregistered securities in violation of N.J.S.A. 49:3-60.

152.    By selling unregistered BIAs to Plaintiffs and Class and Subclass members, Defendants violated the New Jersey Uniform Securities Law, and are liable to Plaintiffs and the members of the New Jersey Subclass.

153.    As a direct and proximate result of Defendants' unregistered sale of BIA securities,

Plaintiffs and members of the Class and Subclass have suffered damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate. N.J.S.A. 49:3-71.

## COUNT VI

### Breach of Contract Against
### (Against All Defendants on behalf of The National Class)

154.    Plaintiffs repeat and reallege each and every allegation above and below as if fully set forth herein.

155.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclass against Defendants.

156.    BlockFi Inc. through its subsidiaries offered "Interest Account Terms" ("IAT") to Plaintiffs and class members for their "crypto repository account" through which investors earned interest in the form of digital assets on the eligible cryptocurrency held in investors' accounts. BlockFi, Inc. is the "provider" of the BIA. "BlockFi Trading, LLC" "is the "provider" of the BlockFi Wallet to US Clients. BlockFi Lending LLC is the "provider" of the BlockFi Reward Program and Crypto Reward Account.

157.    The BIA was accompanied by the "BlockFi Wallet" governed by BlockFi Wallet Terms ( "Wallet Terms.")

158.    BlockFi Wallet trading activities are governed by "Trading Terms" which are between the wallet holder and Defendant BlockFi Trading.

159.    Other than venue provisions in the IAT, Wallet Terms or Trading Terms there are no restrictions on investors rights to sue in a class action.

160.    The IAT contained three "Risk Disclosures" which were generic and irrelevant to the risks concealed by Defendants. The Trading Terms contain four "Risk Disclosures" which

were generic and irrelevant to the risks concealed by Defendants.

161.     Neither the "Terms of Service" or the "Wallet Terms" contained any  risk disclosures.

162.     The Trading Term, IAT, and Wallet Terms constituted valid and binding contracts between Defendants and Plaintiffs, and Class members.

163.     According to the contractual arrangements between defendants and plaintiffs and the Class, interest is calculated by BlockFi using "the daily balance method" whereby BlockFi determines "the interest  rates and tiers for each month at our sole discretion."

164.     BlockFi pays all interest in crypto currency.

165.     BlockFi reserved the right to limit withdrawals based on frequency and amount. (IAT at 2).  Defendants having reserved for themselves all the power and discretion to set interest rates were under a contractual obligation of good faith, and fair dealing to deal fairly, honestly and candidly with investors.  The actions, omissions and conflicts described herein were in breach of Defendants' obligations under the contracts with Plaintiffs and Class members.

166.     As a result, Plaintiffs and Class members have suffered and continue to suffer loss and damage and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

## COUNT VII

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against all Defendants on behalf of The National Class )

167.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

168.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclass against Defendants.

169.     In all contracts law there is an implied covenant of good faith and fair dealing which obligates each contracting party to exercise any discretionary powers granted under the contract to either party in good faith and to avoid any actions, including contractually permissible actions which would defeat the reasonable expectation. Defendants were under an obligation to exercise such discretion in good faith and to deal fairly with Plaintiffs and the Class.

170.     BlockFi retained for itself the discretion to set the interest rates payable to Plaintiffs and class members.  The reservations of that discretion of required Defendants to set an interest rate commensurate with the risk exposure to Plaintiffs and the Class and/or to market full and complete disclosure of all facts relevant to the risks and market conditions and the reasons and manner for Defendants' setting of interest rates.

171.     The contract(s) which is (are) the subject of the claims herein was made in New Jersey and the claims for breach thereof are governed by New Jersey law.

172.     Defendants breached the implied duty of good faith and fair dealing for the reasons set forth herein by acting in bad faith, arbitrarily and unfairly towards Plaintiffs and the Class members and unfairly under valuing the investments made by Plaintiffs and the class and/or paying unfair and inadequate interest to Plaintiffs and the class in light of all risks.

173.     As a result of the foregoing, Defendants breached the implied covenant of good faith and fair dealing under New Jersey law and plaintiffs have been damaged and are entitled to rescission and/or rescissory damages and/ or out of pocket losses and/or equitable relief as appropriate.

## COUNT VIII

### Violation of Consumer Fraud Act, N.J.S.A. §§ 56:8–1 *et seq.*
### (Against all Defendants on behalf of The National Class and New Jersey Subclass)

174.    The allegations contained in the previous paragraphs are incorporated by reference.  This Count is brought on behalf of the Class.

175.    The CFA was designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services.

176.    Defendants and Plaintiffs are "persons" within the meaning of the CFA. N.J.S.A. § 56:8-1(d).

177.    Defendants' advertising and sale of BIA accounts constitute "advertising" and "sale" of "merchandise" and/or "services" within the meaning of the CFA. N.J.S.A. § 56:8-1(a), (c) and (e).

178.    Defendants' practices described above constitute as "unconscionable commercial practice[s], deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission," and therefore, are unlawful under the CFA N.J.S.A. § 56:8-2.

179.    Plaintiffs and the class members have suffered an ascertainable loss of money and property as a result of Defendants' unlawful practices as alleged herein.

180.    Pursuant to N.J.S.A. § 56:8-19, Plaintiffs, on behalf of themselves and the class, seek treble damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate legal or equitable relief.

## COUNT IX

**Violation of Truth-in-Consumer Contract,
Warranty and Notice Act, N.J.S.A. §§ 56:12-14, *et seq.*
(Against all Defendants  on behalf of The National Class and New Jersey Subclass)**

181.    The allegations contained in the previous paragraphs are incorporated by reference. This Count is brought on behalf of the Class.

182.    The TCCWNA was enacted over thirty years ago because "[f]ar too many consumer contracts, warranties, notices and signs contain provisions which clearly violate the rights of consumers. Even though these provisions are legally invalid or unenforceable, their very inclusion in a contract, warranty, notice or sign deceives a consumer into thinking that they are enforceable and for this reason the consumer often fails to enforce his rights." Statement, Bill No. A1660, 1981 N.J. Laws, Chapter 454, Assembly No. 1660, page 2.

183.    The primary goal of the TCCWNA is to prevent confusion and deception among consumers as to both their legal rights, and the responsibilities of businesses operating in New Jersey. TCCWNA accomplishes this goal by prohibiting the use of illegal terms in consumer contracts and notices.

184.    The New Jersey legislature has set forth the following examples of provisions that violate clearly established legal rights and responsibilities under the TCCWNA: "Examples of [] provisions [in violation of the TCCWNA] are those that deceptively claim that a seller or lessor is not responsible for any damages caused to a consumer, even when such damages are the result of the seller's or lessor's negligence. These provisions provide that the consumer assumes all risks and responsibilities, and even agrees to defend, indemnify and hold harmless the seller from all liability." Statement, Bill No. A1660, 1981 N.J. Laws, Chapter 454, Assembly No. 1660, page 2. Bars on punitive damages are also other examples of provisions which violate

TCCWNA.

185.    Defendants are each a "seller, creditor, lender or bailee" under the TCCWNA. N.J.S.A. § 56:12-15.

186.    Plaintiffs are "consumers" under the TCCWNA. Id.

187.    The Terms are a "consumer contract" or "consumer notice or sign" under the TCCWNA. N.J.S.A. §§ 56:12-1 and 56:12-15.

188.    The Terms and Conditions, IAT, Wallet Terms and Trading Terms violate the TCCWNA because they include provisions that violate clearly established legal rights and responsibilities.  N.J.S.A. § 56:12-15.

189.    The Terms and Conditions, IAT, Wallet Terms and Trading Terms contain provisions, as detailed above, that purport to disclaim liability for harm caused 1) by Defendants' negligence, 2) by Defendants' acts that violate the CFA, and 3) by Defendants' malicious, willful or wanton misconduct.  The Terms and Conditions, IAT, Wallet Terms and Trading Terms also contain provisions that could preclude claims for punitive damages. Id.

190.    Pursuant to N.J.S.A. § 56:12-17, Plaintiffs and the Class are entitled to a civil penalty of not less than $100.00, or for actual damages, or both, together with reasonable attorney's fees and court costs, and any additional relief the court deems appropriate.

### COUNT X

**Promissory Estoppel**
**(Against all Defendants on behalf of The National Class)**

191.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

192.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

193.    Defendants made a clear and unambiguous promise to register the BIAs after the Federal and State regulators brought regulatory actions.

194.    The promises to register the BIAs were material to Plaintiffs and the Class.

195.    Defendants accepted the benefits of Plaintiffs' and Class members' investments in the BIAs and their forbearance from withdrawal.

196.    Defendants are now estopped from seeking an exception from registration and must register the shares or pay damages to Plaintiffs and the class.

197.    Plaintiffs and Class members have suffered loss and damage.

## COUNT XI

### Unjust Enrichment
### (Against all Defendants on behalf of The National Class )

198.    Plaintiffs hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

199.    Plaintiffs brings this claim individually and on behalf of the members of the Class against Defendants.

200.    Plaintiffs and members of the Class conferred a benefit on Defendants in the form of monies and cryptocurrencies paid to Defendants for the purpose of enrolling in a BIA account offered by Defendants.

201.    Defendants voluntarily accepted and retained this benefit by accepting payment of money and cryptocurrency from Plaintiffs and Class members in exchange for the BIA account, when Defendants knew that the BIA accounts were risky unregistered securities.  Defendants used the money and cryptocurrencies paid to them to enrich themselves in the form of investing and lending out the cryptocurrencies, or trading with the same.

202.    Defendants have retained this benefit. No part of the SEC and state settlement in

February 2022 has been earmarked for disgorgement. Accordingly, Defendants should disgorge the money and cryptocurrency accepted in exchange for the BIAs and/or for its profits.

203.     It would be unjust and inequitable for Defendants to retain the benefit, and Defendants should be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment as to all counts  against Defendant, as follows:

(a)     For an order certifying the Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass;

(b)     For an order finding in favor of Plaintiffs and the Class and Subclass on all counts asserted herein;

(c)     For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(d)     For rescission as may be applicable;

(e)     For disgorgement of all monies unjustly held by defendants and/ or profits unjustly earned;

(f)     For an accounting;

(g)     For prejudgment interest on all amounts awarded;

(h)     For an order of restitution and all other forms of equitable monetary relief;

(i)     For injunctive relief as pleaded or as the Court may deem proper; and

(j)     For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: July 28, 2022                              Respectfully submitted,

By:    */s/ Frederick J. Klorczyk , III*
         Frederick J. Klorczyk , III

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk , III
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant (Admitted *PHV*)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com

**SQUITIERI & FEARON, LLP**
Lee Squitieri
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492
Email: lee@sfclasslaw.com

**MOORE KUEHN, PLLC**
Fletcher Moore (Admitted *PHV*)
Justin Kuehn (Admitted *PHV*)
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245
Email:  fmoore@moorekuehn.com
          jkuehn@moorekuehn.com

*Attorneys for Plaintiffs*